IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RANDY HANSON and
JENNIFER HANSON,

                              Plaintiffs,

      v.

SANTANDER CONSUMER USA, INC.,

                              Defendant.

               OPINION AND ORDER

                     22-cv-623-wmc

---

Plaintiffs Randy and Jennifer Hanson brought this putative class action in state court, seeking injunctive and monetary relief for themselves and other Wisconsin buyers allegedly harmed by defendant Santander Consumer USA, Inc.'s repossession and deficiency collection practices in violation of the Wisconsin Uniform Commercial Code ("UCC"). More specifically, the Hansons claim that notices sent by Santander regularly misrepresented the amount of a borrower's actual loan deficiency following the sale of a repossessed vehicle by subtracting proceeds of the sale, rather than the fair market value of the vehicle.

Once this action was timely removed to federal court under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), the Hansons moved for class certification, while Santander moved for summary judgment. (Dkt. ##19, 32.) Because Santander suggested in its briefing on both motions that the Hansons lacked standing to sue unless they were actually injured by its allegedly defective notices (dkt. #33, at 34 & n.30; dkt. #42, at 11), the court granted the Hansons' further motion for additional briefing (dkt. #47). In their supplemental briefing, the parties later agreed that the court may exercise

subject matter jurisdiction as to all of plaintiffs' claims, albeit for different reasons and despite this question not being something to which the parties can simply stipulate. (Dkt. ##53 and 56-57.) Finally, the Hansons filed a motion to stay further proceedings in this case pending decisions in two similar cases on appeal in state court. (Dkt. #60.)

For the reasons explained below, the court finds that while it has jurisdiction to decide the principal legal issue presented -- whether the UCC precludes Santander from reducing the Hanson's outstanding debt by the amount it obtained at a wholesale auction to other dealers, rather than at a retail, public auction or based on a "fair market value" assessment -- the Hansons have failed to show that Santander violated that law, nor that this court should. Accordingly, defendant is entitled to summary judgment as to all claims, rendering plaintiffs' motion for class certification moot.

## UNDISPUTED FACTS[1]

In July 2021, the Hansons entered into an auto loan agreement secured by a KIA Sportage to finance their purchase of that vehicle (the "vehicle"). This loan was later assigned to Santander. After the Hansons failed to make loan payments due on the vehicle for September, October, and November of 2021, Santander then sent the Hansons a "Notice of Right to Cure Default." Because the Hansons were unwilling or unable to cure their default, Santander proceeded to repossess the vehicle in July 2022, prompting Mrs. Hanson to speak with their attorney about potential options.

---

[1] Unless otherwise noted, the following facts are material and undisputed as drawn from defendant's proposed findings of fact and plaintiffs' responses.

Soon after the repossession, Santander next sent the Hansons an additional notice, which advised them of the repossession and its intent to sell the vehicle, sometimes referred to as a "Pre-Sale Notice." Specifically, this second notice: (1) explained that the Hansons could have the vehicle returned to them through reinstatement or redemption of the loan; (2) advised that the Hansons could call or write Santander if they needed more information; and (3) outlined Santander's plan to sell the vehicle at a private sale. This Pre-Sale Notice further described the effect of the sale on the Hansons' loan balance:

> The money we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you <u>X</u> will __ not (as checked) still owe us the difference.

(Dkt. #36, at 5.)

After reviewing the Pre-Sale Notice, Mrs. Hanson contacted Santander to discuss reinstatement, but took no further action to reinstate or redeem the loan or otherwise seek return of the vehicle. Further, plaintiffs concede that had the language of the Pre-Sale Notice allowed for a reduction in the amount owed by the "fair market value" of the vehicle, the amount it actually sold for, Mrs. Hanson would *not* have changed her decision not to seek reinstatement or redemption of the loan. (Dkt. #50 ¶ 47.) As for Mr. Hanson, he never even reviewed the Pre-Sale Notice. (Dkt. #50 ¶ 39.)

Santander followed its regular repossession and sale procedure with respect to the Hansons' vehicle, although because of frame and body damage to the vehicle, Santander hired an "asset recovery company" to assess repair costs before consigning the vehicle for sale to Manheim, a "dealer-only auction house." Manheim's vehicle condition report noted that damage and estimated repair costs to the vehicle was determined to be $1,292.00, but

3

based on that report, Santander did not find performing repairs before sale made financial sense.  Rather, using average Manheim Market Report ("MMR") and JD Power price guidance as benchmarks, Santander set the floor price for the vehicle at auction at $12,000. With assurances from Santander regarding its condition and quality, the vehicle sold for $13,900.

Santander then informed the Hansons as to the outcome of the auction by sending them an "Explanation of Calculation of Surplus or Deficiency" ("Post-Sale Notice"), which, consistent with the language of its Pre-Sale Notice, subtracted the vehicle's actual sale price at auction (as opposed to any fair market valuation) to calculate the Hansons' remaining outstanding balance of $11,164.20.  (Dkt. #50 ¶ 189.)  Believing that Santander sold their vehicle for too low of a price, the Hansons have submitted an expert report from Ryan Tate, a consultant for a national automobile dealer, who opines that private-sale or dealer-only auctions do not obtain the fair market value of a vehicle because they fail to maximize the vehicle's sale price, unlike public auctions.  (Dkt. 44, at 3 and 9.)  However, Tate provides *no* estimate of a supposedly higher, assessed market value for the vehicle at issue, especially as damaged, *and* he also admits that:  (1) the industry standard practice for creditors like Santander *is* to sell repossessed vehicles at dealer-only auctions; (2) he has no knowledge of how public auctions or dealer-only auctions analyze market and pricing; and (3) his limited knowledge of dealer-only auctions ended altogether in 2008, fourteen years before the sale of the Hansons' repossessed, damaged vehicle.

After notifying the Hansons of their remaining deficiency, Santander reported this debt to credit reporting agencies and attempted to collect payments on the debt on its own,

4

as well as through collection attorneys, but has yet to seek or obtain a deficiency judgment against them. To date, the Hansons have also neither disputed this debt nor paid any portion of the deficiency; expressed an intent to pay any portion of the deficiency; forgone other opportunities because of the debt; or indicated how the debt has or will impact their credit score.

Instead, in October 2022, the Hansons filed this action in state court both on behalf of themselves and other, similarly-situated Wisconsin borrowers to whom Santander also allegedly sent insufficient notices. In addition to money damages for unspecified economic losses, plaintiffs seek: (1) statutory damages for the alleged UCC violations in the amount of the credit service charge, plus 10% of the deficiency obligation; and (2) an injunction preventing Santander from engaging in this allegedly deceptive practice in the future, including any future collection of so-called inflated deficiency balances and directing it to remove any wrongfully-reported debt information to credit reporting agencies or others. (Dkt. #1-2, at 19-24.)

OPINION

I.     **Standing**

In its motion for summary judgment and response to plaintiffs' motion for class certification, defendant asserted that this court lacks subject matter jurisdiction over plaintiffs' claims unless they can establish some injury caused by the allegedly defective debt notice. (*See* dkt. ##33, at 32–35 & n.30; dkt. #42, at 11.) Accordingly, the court granted plaintiffs' motion for additional briefing on this subject. (*See* dkt. ##53 and 56-57.) In their briefing, however, the parties seemingly "agreed" that jurisdiction in this

court was proper, ignoring that subject matter jurisdiction is not something to which parties can stipulate. *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) (standing is an "essential ingredient of subject-matter jurisdiction," and as such, is a "threshold requirement because it derives from the Constitution's limit on federal courts' authority to resolve 'cases' and 'controversies' ") (citation omitted).

This is because Article III of the Constitution limits the jurisdiction of the federal courts to "cases and controversies" to ensure that the judiciary "confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013)). For the same reason, following removal under 28 U.S.C. § 1447(c), a federal district court must remand a case back to state court "[i]f at any time before final judgment it appears [to] lack[] subject matter jurisdiction." *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018). Further, the party seeking to remain in federal court must "establish standing with evidence offered at summary judgment, and . . . in the face of any adverse evidence introduced at trial." *Pierre*, 29 F.4th at 939. Finally, the elements of standing include: (1) a concrete and particularized injury in fact; (2) that is traceable to the defendant's conduct; and (3) that can be redressed by judicial relief. *Id.* at 937 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

In particular with respect to consumer statutory claims, spurred on by what is perceived as a heightened emphasis on standing by the United States Supreme Court, the Seventh Circuit has repeatedly emphasized that concrete harms must *include* "traditional

6

tangible harms, such as physical harms and monetary harms, as well as [v]arious intangible harms, such as reputational harms, disclosure of private information, and intrusion upon seclusion." *Pierre*, 29 F.4th at 938 (internal quotations and citations omitted). Additionally, a person facing the risk of *future* harm may pursue forward-looking, injunctive relief to prevent that harm from occurring, at least so long as the risk of future harm is sufficiently imminent and substantial. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021); *see also Pierre*, 29 F.4th at 938 (risk of harm qualifies as a concrete injury for injunctive relief

Plaintiffs allege that they have suffered concrete harm and are entitled to relief under six, separate counts. In Counts I-IV, plaintiffs seek monetary relief under Wis. Stat. § 409.625(2) for the alleged violation of four, different UCC provisions: (1) requiring a commercially-reasonable disposition of the repossessed property (Wis. Stat. § 409.610); (2) requiring a reasonable and accurate notice of the disposition (Wis. Stat. § 409.611); (3) requiring statutorily-mandated disclosures (Wis. Stat. § 409.614); and (4) providing a proper explanation of the loan deficiency (Wis. Stat. § 409.616). In Counts V and VI, plaintiffs seek injunctive relief under Wis. Stat. § 409.625(1) and common law, respectively, for defendant's alleged violation of those same UCC provisions.[2] However, the record does not support an inference that plaintiffs suffered concrete harm under any of these counts, save prospective injury from Santander continuing to pursue payment of an allegedly improperly calculated debt.

---

[2] Although relief is sought under the Wisconsin UCC, these causes of action all rely in part on plaintiffs' contention that Wisconsin Consumer Act, specifically Wis. Stat. § 425.210, modifies creditors' obligations.

With respect to these claims, plaintiffs make two, basic assumptions to prove a concrete injury: (1) the UCC provides mandatory, statutory damages as a proxy for actual damages; and (2) Article III standing exists for violations of state statutes alone. However, pointing to the Supreme Court's holding in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), that "Article III standing requires a concrete injury even in the context of a statutory violation," *id.* at 341, the Seventh Circuit has held that even a statutory violation does not, on its own, convey standing absent an underlying concrete, particularized injury. *See Markakos v. Medicredit, Inc.*, 997 F.3d 778, 780-81 (7th Cir. 2021) (collecting cases holding that "precedent . . . faithfully holds that a statutory violation alone does not cause an injury in fact"); *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 332 (7th Cir. 2019) (citing *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017)) ("[A] plaintiff cannot satisfy the injury-in-fact element of standing simply by alleging that the defendant violated a disclosure provision of a consumer protection statute."). In short, the allegations of a statutory violation and remedy alone are apparently insufficient to grant this court subject matter jurisdiction.

In the odd position of asserting that plaintiffs have suffered a concrete injury to support its removal of suit to federal court, defendant discusses the allegations in the complaint and plaintiff's statements in interrogatories and depositions at length. Specifically, defendant argues a concrete injury may be found by crediting plaintiffs' allegations that they are seeking damages for financial and emotional harm suffered when defendant sent notices with an overstated debt, attempted to collect the overstated debt, and reported the overstated debt to credit agencies. However, at summary judgment, mere

allegations are no longer sufficient; rather, parties must submit evidentiary materials that would support a finding of those factual allegations at trial. *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). Accordingly, the court must review each count brought by plaintiffs to determine if the record supports a finding or reasonable inference that plaintiffs suffered or will suffer a concrete harm.

To begin, plaintiffs claim monetary damages for emotional and financial injury caused by UCC violations in Counts I-IV. Even if defendant's conduct violated the statutes identified by plaintiff and their debt was overstated, however, the record does not support an inference that plaintiffs here suffered any *concrete* harm to date. First, the record is absent of evidence demonstrating that plaintiff suffered a financial injury. Specifically, the plaintiffs have not made any payments on the remaining debt at issue, failed to make payment on another debt, nor even abstained from some other purchase. Even if this were not so, plaintiffs have offered no proof that the reduced size of their properly calculated debt to defendant would be *material*, since plaintiffs' own expert does not opine as to how much greater a so-called "fair market value assessment" would be over the price for which their vehicle actually sold at auction. Indeed, plaintiffs' expert at most opined merely that fair market value would likely be "higher," leaving layers of speculation as to what that difference would have meant to plaintiffs' creditors or credit reporting agencies, when the fact of their unpaid debt would still number in the thousands of dollars after a forced repossession and deduction for the vehicle fair market value.

Second, the record does not support a finding of reputational injury. In *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146 (7th Cir. 2022), the Seventh Circuit, for example, held that the dissemination of false and defamatory information to credit reporting agencies who understand its defamation *may* cause a concrete injury sufficient for Article III standing, but only with some evidence of the significance of that information on plaintiff's credit worthiness. *Id*. at 1153. Here, the record reflects that credit reporting agencies received communications from defendant that may have included an inflated debt; however, this only shows receipt, rather than how the information was evaluated by the credit reporting agencies or how third parties understood that information. *Compare Ewing*, 24 F.4th at 1154 (plaintiff showed defamatory nature of communication by submitting evidence that a third party's assessment of their credit worthiness took into account whether a debt was disputed or not) *with Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 709-10 (7th Cir. 2024) (concluding that third parties receiving inaccurate reporting did not indicate anything about their assessment of the plaintiff's creditworthiness). Such an injury here is particularly suspect given, as just discussed, this *may* be a matter of an inaccurate report as to the exact amount of a debt, not of the fact of a debt, the reason for its existence, nor any evidence that any inaccuracy of its size was material. Therefore, like *Freeman*, where no evidence in the record demonstrated how the defendant's error impacted plaintiffs' creditworthiness, this court must conclude that plaintiffs were not defamed when defendant reported plaintiffs' debt to credit reporting agencies, but failed to show understanding.

Third, and finally, emotional harm is insufficient on its own to constitute a concrete injury for standing purposes, it must be accompanied by *some* evidence of harm caused by defendant's conduct, such as reputational or financial harm. *See Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 639 (7th Cir. 2023) ("[C]onfusion was not enough to create an injury in fact. Rather, the plaintiff must show a harm beyond emotional response, such as an adverse credit rating or detrimental action that the plaintiff took in reliance on the letters.") (citations omitted). As discussed above, the record does not support a finding of any of these harms.

Because the record is insufficient to support an inference that plaintiffs suffered concrete harm to date in their claims for monetary relief, this court would lack subject matter jurisdiction as to those claims alone. However, plaintiff also seeks injunctive relief in this case, and as also discussed above, this court may still have subject matter jurisdiction over claims for injunctive relief if the risk of harm is both imminent and substantial. *TransUnion LLC*, 594 U.S. at 435. Again, plaintiffs specifically allege that defendant's collection and reporting activities will cause them irreparable injury going forward. However, the risk of these harms occurring is not supported by the record. As to defendant's reporting activity, plaintiff argues that by reporting an inflated debt amount, their creditworthiness will be negatively impacted. Unfortunately, the record at summary judgment does not include evidence as to how the credit reporting agencies assessment of plaintiffs' creditworthiness would be impacted by defendant's allegedly inflated debt report; nor, again, whether any difference in the amount of debt reported is material. With no evidence to support that defendant's reporting activity will harm plaintiff, at least any

11

more than a more accurate accounting of their outstanding debt, the court must conclude that it is not imminent or substantial and, thus, not concrete.

As to defendant's collection activity, plaintiffs allege they are at risk of overpaying their debt. Specifically, plaintiffs have stated that receiving notices and calls from defendant and collection agencies regarding an inflated debt has put them at risk of overpaying. However, receiving information of a falsely stated debt is neither sufficiently imminent nor substantial to be a concrete harm by itself. *See Nettles v. Midland Funding LLC*, 983 F.3d 896, 900 (7th Cir. 2020) (plaintiff who received letters that overstated the amount of her debt failed to allege a concrete harm because her complaint did not allege any appreciable risk of harm); *see also Montgomery v. Everest Receivable Servs., Inc.*, No. 21 C 3535, 2021 WL 4806388, *2 (N.D. Ill. Oct. 14, 2021) (plaintiff failed to allege a concrete harm after receiving two emails which gave the erroneous impression of money due and owing on multiple accounts but did not allege some other injury). Here, although plaintiffs have alleged risk of overpayment, the record at summary judgment does not support a jury reasonably inferring this risk, because: no payments have been made; no further promise to pay has been made; and no money has been set aside pending the result of this or other actions. With no evidence supporting at least an intention to make a payment on the debt, there is no reasonable inference to support a risk of a wrongful payment is sufficiently imminent or substantial.

Still, this is not a case where the defendant is now conceding that the debt sought in collection *is* inflated and *will* be reduced. On the contrary, Santander intends to collect the amount it claims *is* due, while plaintiff claims the amount owed must be recalculated

under Wisconsin law.  Without regard to whether the amount in dispute will impact plaintiffs' credit score was or will be negatively impacted, therefore, a classic concrete controversy between the parties (and other putative class members) over what amount is owed obviously remains and is entitled to resolution.  Indeed, ultimately, plaintiffs have submitted evidence from which the court can reasonably infer that defendant's ongoing collection and/or reporting of materially inaccurate adverse credit information regarding plaintiff's alleged debt could cause plaintiffs to suffer both monetary harm -- by eventually being forced to pay more than they should on their remaining debt -- and even reputational harm -- by having an allegedly false debt misreported to credit rating agencies until *overpaid*, at least conceivably impacting their ability to secure credit in the future.[3]

## II.     Plaintiffs' Motion to Stay

Next, plaintiffs have moved for a stay, invoking the court's inherent power to stay cases before it, because "identical legal issues and arguments are pending appeal (and awaiting a decision) at the Wisconsin Court of Appeals" in *Daniel Birge et al. v. Simplicity Credit Union*, 2024AP567, and *Amy Steinberger v. Santander Consumer USA, Inc.*, 2024AP2254, in which plaintiffs' counsel here is already representing other debtors.  (Dkt. #60, at 2.)  Plaintiffs contend that waiting for these decisions could prevent unnecessary waste of the court's time, as well as plaintiffs' resources in providing class notice.

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for

---

[3] That said, the court finds below that defendant is entitled to summary judgment on the merits with respect to plaintiffs' claims that defendant's debt calculation violated the UCC.

itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). The general test for imposing a stay requires the court to "balance interests favoring a stay against interests frustrated by the action" in light of the court's strict duty to exercise jurisdiction in a timely manner. *Cherokee Nation of Oklahoma v. United States*, 124 F.3d 1413, 1416 (Fed. Cir. 1997) (*citing Landis*, 299 U.S. at 255). Courts often consider the following factors when deciding whether to stay an action: (1) whether the litigation is at an early stage; (2) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (3) whether a stay will simplify the issues in question and streamline the trial; and (4) whether a stay will reduce the burden of litigation on the parties and on the court. *Grice Engineering, Inc. v. JG Innovations, Inc.*, 691 F. Supp. 2d 915, 920 (W.D. Wis. 2010); *Holden v. Arbor Green, Inc.*, 2024 WL 2049019 (W.D. Wis. 2024). It is the party requesting a stay that "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Indeed, federal courts have a "virtually unflagging obligation" to "exercise the jurisdiction given them," absent "exceptional circumstances." *Colorado River Water Conserv. Distr. V. U.S.*, 424 U.S. 800, 817 (1976); *see also R.R. Street & Co., Inc. v. Vulcan Materials Co.*, 569 F.3d 711, 715 (7th Cir. 2009) (citing same).

The court concludes that plaintiffs fail to meet this high burden. Rather, the four factors governing the court's exercise of discretion with respect to a stay weigh in favor of denying plaintiffs' motion under the circumstances. *First*, this action is not at an early stage, as the parties have conducted discovery and filed motions for class certification and summary judgment. *Second*, defendant would be prejudiced by a stay because it is not a

party to one of the two state court actions currently on appeal and, if a stay were granted, defendant could still be bound by the holding in *both* cases. *Third*, a decision in those state cases has already been pending for some time with no indication of when a decision might issue. Those decisions would also likely be appealed to the Wisconsin Supreme Court, further extending the length of any requested stay in this case indefinitely. *Fourth*, and finally, while decisions made by the Wisconsin Courts of Appeals may create precedent affecting the principal legal question in this case, unlike this court, the Seventh Circuit has the power to certify that issue to the Wisconsin Supreme Court should it believe the issue sufficiently close and deserving of review by a Wisconsin state court. Therefore, the court will deny plaintiffs' motion for a stay.

## III.     Defendant's Motion for Summary Judgment

Generally, courts decide class certification before summary judgment, but the court's review of defendant's motion for summary judgment reveals that plaintiffs' claims lack merit, which means plaintiffs are not proper class representatives. *Germain v. Bank of Am., N.A.*, No. 13-CV-676-BBC, 2014 WL 5802018, at *1 (W.D. Wis. Nov. 7, 2014) (finding same). Therefore, the court will decide the summary judgment motion before the question of class certification. *See Wiesmueller v. Kosobucki*, 513 F.3d 784, 786 (7th Cir. 2008) ("[T]he fact that a suit lacks merit does not 'moot' the question of class certification. . . . Which is not to say that the district judge may never dismiss a case on summary judgment without first ruling on the plaintiff's motion to certify a class."); *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) ("The bank elected to move for summary judgment before the district judge decided whether to certify the suit as a class

action. This is a recognized tactic . . . and does not seem to us improper.") (citations omitted).[4]

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute of "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

More specifically, as the Seventh Circuit has oft observed, summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (citing Fed. R. Civ. P. 56(e)).

---

[4] Although this procedure might prejudice defendant, because it means that potential class members may still raise claims against it, defendant here has expressly requested that the court rule on its motion for summary judgment before determining whether class certification is appropriate (*see* dkt. #42, at 10-11), and plaintiffs do not object, provided that the court first address standing, which it has.

Here, defendant contends that it is entitled to summary judgment on two primary grounds: 1) plaintiffs' claims are based on the incorrect premise that the WCA supersedes the UCC and expands the disclosure requirements for post-repossession notices; and (2) even if the WCA supersedes the UCC, defendant's post-repossession notices comply with those statutory requirements. The court addresses both arguments below.

As an initial matter, under Wisconsin law, plaintiffs cannot maintain a common law claim for injunctive relief when a statute gives rise to the same claim. *See Adams v. Northland Equip. Co.*, 2014 WI 79, ¶ 66, 356 Wis. 2d 529, 850 N.W.2d 272 ("Because it is Wis. Stat. § 102.29(1), and not the constitution or the common law that gives rise to and defines Adams' claim, his interest is coterminous with the statutory claim."). In this case, § 409.625(1) gives rise to the injunctive relief plaintiffs seek in this case by providing that: "If it is established that a secured party is not proceeding in accordance with this chapter, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." Therefore, the court need not consider plaintiffs' common law claim for injunctive relief. Regardless, for the reasons explained below, the court finds as a matter of law that defendant's notices do not violate the UCC because the disposition of plaintiffs' vehicle was commercially reasonable. Therefore, the court will grant defendant's motion for summary judgment as to all of plaintiffs' claims. Because Counts I, II, and IV each depend in substantial part on plaintiffs' allegation in Count III -- that defendant's notice and method of calculation is defective -- the court begins its analysis there before turning to plaintiffs' remaining claims for releif.

17

## A. Content and Form for Mandated Disclosures (Count III)

Plaintiffs contend that defendant's Pre-Sale Notice violates Wis. Stat. § 409.614(1) by failing to properly describe any liability for a deficiency they may face following the sale of repossessed property.[5]  Specifically, they argue that the WCA, Wis. Stat § 425.210,[6] modifies the requirements of creditor pre-sale notices contained in Wis. Stat. § 409.614(1) by requiring a creditor to notify customers that their deficiency amount is based on the fair market value of their property.

To begin its analysis, therefore, the court will address the creditor pre-sale notice obligations created by the UCC.  *See Wittman v. Koenig*, 831 F.3d 416, 420 (7th Cir. 2016) (citing *See State ex rel. Kalal v. Circuit Court for Dane County*, 271 Wis.2d 633, 681 N.W.2d 110, 123-26 (2004)) ("As instructed by the Wisconsin Supreme Court, the court first considers the statute's language and also look[s] to the statute's structure and purpose to inform our analysis of the statutory language. If the language is ambiguous, we may also consider external sources such as legislative history, albeit with suitable caution.").  The court then will consider those terms as they apply to defendant's Pre-Sale Notice, before addressing plaintiffs' arguments that the WCA modifies the UCC requirements.

---

[5] The relationship between obligations owed under the UCC and WCA is discussed in Wis. Stat. § 421.103(3), which states that "[u]nless superseded by the particular provisions of chs. 421 to 427 parties to a consumer transaction have all of the obligations, duties, rights and remedies provided in chs. 401 to 411 which apply to the transaction."  However, plaintiffs have expressly stated they are not arguing that the language of Wis. Stat. § 425.210 supersedes Wis. Stat. § 409.614(3).

[6] Wis. Stat. § 425.210 states that "if a creditor is entitled to a deficiency judgment pursuant to s. 425.209(1), the creditor shall be entitled to recover from the customer the deficiency, if any, remaining after deducting the fair market value of the collateral from the unpaid balance."

Principally adopting language from the U.C.C., § 409.614 dictates detailed, presale notice obligations before a creditor may dispose of a consumer good that secures a debt. However, the only notification requirement that plaintiffs argue defendant failed to satisfy before selling plaintiffs' vehicle is found at Wis. Stat. § 409.614(1)(b), which mandates the inclusion of "[a] description of any liability for a deficiency of the person [following the sale] to which the notification is sent." The sample form in Wis. Stat. § 409.614(3), which is also referred to as a "safe harbor" provision, suggests this requirement can be accomplished by stating that:

> The money that we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you …. [will or will not, as applicable] still owe us the difference. If we get more money than you owe, you will get the extra money, unless we must pay it to someone else.

Here, defendant's Pre-Sale Notice followed this safe harbor provision closely, advising plaintiffs that:

> The money we get from the sale (after paying our costs) will reduce the amount you owe. If we get less money than you owe, you <u>X</u> will _ not (as checked) still owe us the difference.

Moreover, Wis. Stat. § 409.614(3) provides that when the sample statutory form is "completed," a creditor's notice "provides sufficient information."[7] Under a plain reading of the statute, having adopted language essentially tracking the form language in Wis. Stat. § 409.614(3), defendant's notice appears to provide just the information required by Wis. Stat. § 409.614(1), precluding a reasonable jury from finding otherwise.

---

[7] Black's Law Dictionary defines "sufficient" as "adequate; of such quality, number, force, or value as is necessary for a given purpose." Black's Law Dictionary (11th ed. 2019).

Nevertheless, plaintiffs argue that the WCA modified the UCC's pre-sale notice disclosure requirements, *including* the safe harbor opportunity, in three material ways:  (1) defendant never "completed" the sample form in § 409.614(3), having failed to include additional, substantive information about the deficiency computation as required by § 425.210; (2) Wis. Stat. § 409.614(6) requires that the UCC and WCA be read together; and (3) Wis. Stat. § 409.614(5) requires other language to prevent defendant's notice from being misleading.   First, plaintiffs argue the requirement that the form notice be "completed" in Wis. Stat. § 409.614(3) means that creditors *must* modify the blank sections and substantive text of the statutory form relating deficiency balance to include an actual deficiency computation required by Wis. Stat. § 425.210.  The obvious problem with this construction is that the actual, safe harbor form language in § 409.614(3) contains no such information.  Thus, construing the term "completed" in this manner fails to give reasonable effect to the statutory text as written, not only violating Wisconsin's rules of statutory construction but rendering that statutory safe harbor unfairly misleading itself.  *See Kalal*, 2004 WI ¶ 46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage.").

Second, plaintiffs point to Wis. Stat. § 409.614**(6)**, stating that "[i]f a notification under this section *is not in the form of sub. (3)*, law other than this chapter determines the effect of including information not required by sub. (1)."  In other words, for creditors that do not follow the language in Wis. Stat. § 409.614(3), the notice would need to be evaluated under other law.  *Id*. (emphasis added).  However, where a party *has* followed the form of sub. (3), as defendant did in this case, other law does *not* need to be considered.

20

Third, and finally, plaintiffs argue that the WCA modifies the UCC in Wis. Stat. § 409.614**(5)** by requiring that a safe harbor "notification in the form of sub (3) is sufficient, even if it includes errors in information *not required by sub. (1)*, <u>unless</u> the error is misleading with respect to rights arising under this chapter." *Id*. (emphasis added). Thus, creditors that include additional, misleading information *not* required to be provided in the general notice provision of Wis. Stat. § 409.614(1), render the notice to be insufficient.[8]  However, Wis. Stat. § 409.614(5) does not apply in this case because defendant's notice followed the form notice exactly and *did not* include any additional information, misleading or otherwise.

As a result, the language in Wis. Stat. § 425.210 neither modifies nor adds to the statutory requirements laid out in Wis. Stat. § 409.614(1).[9]  By following the statutory form included in Wis. Stat. § 409.614(3), therefore, defendant informed plaintiffs of their deficiency as required and is entitled to summary judgment on Count III.  Moreover, because plaintiffs' claims in Count II -- requiring a "reasonable authenticated notification"

---

[8] A notification of disposition must provide the following information:
> (a) The information specified in s. 409.613(1);
> (b) A description of any liability for a deficiency of the person to which the notification is sent;
> (c) A telephone number from which the amount that must be paid to the secured party to redeem the collateral under s. 409.623 is available; and
> (d) A telephone number or mailing address from which additional information concerning the disposition and the obligation secured is available.

Wis. Stats. § 409.614(1).

[9] Wisconsin circuit courts came to similar conclusions, holding that the WCA does not supersede or add to the requirements of the UCC "safe harbor," presale notices in *Steinberger v. Santander Consumer USA, Inc.*, Dane County Case No. 2023sc5615, and *Daniel Birge et al vs. Simplicity Credit Union*, Wood County Case No. 2022cv-206.  Both cases currently on appeal in the Wisconsin Court of Appeals.

-- and Count IV -- requiring an "explanation" of the deficiency calculation -- are both premised on the same, alleged and now-rejected error in defendant's notice, the court must also grant defendant summary judgment on Counts II and IV.

## B. Requirements for the Disposition of Collateral (Count I)

As for plaintiffs' remaining count, they assert that defendant violated Wis. Stat. § 409.610(2), which informs creditors that "every aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable." Specifically, under Wis. Stat. § 409.627(2), the disposition of collateral is commercially reasonable if done: "(a) [i]n the usual manner on any recognized market; (b) [a]t the price current in any recognized market at the time of the disposition; or (c) [o]therwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Plaintiffs further assert that whether the disposition is "commercially reasonable" is a question of fact, making summary judgment inappropriate.[10] However, that is only true if there is a dispute as to a *material* fact that would support a ruling in plaintiffs' favor.

To support their contention that the disposition of the vehicle was commercially reasonable, defendant provided an opinion from its expert, Hudkins, who describes the process used to: evaluate the vehicle for sale; identify defects; and assess a price based on comparable sales at auction. Specifically, defendant provided proof of the condition of the

---

[10] Plaintiffs also argue that the defendant's deficient notice supports a finding that the disposition was not commercially reasonable; however, as discussed above, the notice was not legally deficient and, therefore, does not support plaintiffs' argument either.

vehicle at the time of sale, the repair estimates, any expected added value, and the process for setting the vehicles floor price at auction.  This evidence at least provides prima facie evidence that the conduct of the sale of plaintiffs' vehicle was commercially reasonable, having been sold in the usual manner for the automobile dealer industry and at a current price in a recognized market.

In contrast, plaintiffs have submitted no evidence contesting this prima facie showing, including that defendant disposed of their vehicle in conformity with reasonable commercial practices.  Instead, they rely on a far weaker expert opinion from Tate, asserting that defendant must sell its repossessed vehicles at a public, retail auction to be "commercially reasonable," rather than sell in dealer-only, wholesale auction.  More specifically, because public auctions are "retail" and "open to the public," plaintiffs claim they are more likely to obtain higher prices than dealer-only auctions, which he labels as "wholesale."  Tate further opines that by failing to achieve these greater sale prices, a trier of fact could find dealer-only auctions result in sales not being commercially reasonable under Wis. Stats. §§ 409.611, 409.614, and 409.625.

However, evidence that the sale price "could" have been obtained by "a different method from that selected by the secured party is *not* … sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner."  Wis. Stat. § 409.627(1) (emphasis added).  Moreover, Wis. Stat. § 409.627(2) does *not* require disposition of the property to be at "fair market value."  Rather, it states that a disposition is "commercially reasonable" if it

23

conforms "with reasonable commercial practices among dealers in the type of property that was the subject of the disposition," which plaintiffs' expert admits it does.

Accordingly, defendant has demonstrated that there is no dispute as to a material fact and that it is entitled to summary judgment as a matter of law on all alleged violations of the UCC. Therefore, plaintiffs' claims for monetary relief (Counts I-IV) as well as injunctive relief (Counts V-VI) are dismissed. Finally, because plaintiffs' claims lack merit, plaintiffs are not proper class representatives and their motion for class certification is denied as moot. *Germain*, 2014 WL 5802018, at *1.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion to stay (dkt. #60) is DENIED.

2) Defendant's motion for summary judgment (dkt. #32) is GRANTED.

3) Plaintiffs' motion for class certification (dkt. #19) is DENIED as moot.

4) The Clerk of Court is directed to enter judgment consistent with this opinion and close this case.

Entered this 3rd day of September, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge